UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

RAYTHEON COMPANY,

     Plaintiff,

v.

ITT CORPORATION, ITT DEFENSE AND
INFORMATION SOLUTIONS, ITT
NIGHT VISION, ITT GEOSPATIAL
SYSTEMS, EXELIS INC. d/b/a ITT
EXELIS, and ITT EXELIS GEOSPATIAL
SYSTEMS,

     Defendants.

Civil Action No. _____

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Raytheon Company ("Raytheon") files this Original Complaint against Defendants ITT Corporation, ITT Defense and Information Solutions, ITT Night Vision, ITT Geospatial Systems, Exelis Inc. d/b/a ITT Exelis, and ITT Exelis Geospatial Systems (collectively, "ITT"), and would show the Court the following:

## I.    INTRODUCTION

1.    The United States Army placed a prime contract with ITT to purchase night vision goggles, and in turn, ITT subcontracted a portion of that effort to Raytheon.  In particular, ITT signed a binding subcontract with Raytheon to purchase infrared thermal cameras and subsequently incorporate Raytheon's hardware into its night vision goggles.  Raytheon designed, developed, and produced these thermal cameras in strict compliance with all contractual specifications—at great expense—

yet ITT has consistently and unreasonably refused to submit the cameras for government approval and accept delivery of all this hardware.

2.      When confronted with its defective behavior, ITT could not demonstrate a failure to perform on the part of Raytheon.  Instead, ITT boldly stated that it had found another supplier and no longer wanted Raytheon's thermal cameras. Unfortunately for ITT, it has a binding subcontract with Raytheon, and ITT must honor that agreement by accepting and paying for Raytheon's cameras.  The repeated failure of ITT to move forward with the Raytheon subcontract has given rise to a material breach of contract and requires that ITT pay Raytheon damages as outlined in this Complaint.

## II.      PARTIES

3.      Plaintiff Raytheon Company is a Delaware corporation with its principal place of business in Waltham, Massachusetts.

4.      Defendant ITT Corporation is an Indiana corporation with its principal place of business in White Plains, New York.  ITT Corporation can be served with process through its registered agent, CT Corporation System, 350 N. St. Paul Street, Suite 2900, Dallas, Texas, 75201.

5.      Defendant ITT Defense and Information Solutions is or was, upon information and belief, an unincorporated segment of ITT Corporation.  It can be served with process through ITT Corporation's registered agent.

6.      Defendant ITT Night Vision is or was, upon information and belief, an unincorporated division of ITT Defense and Information Solutions, which is an

unincorporated segment of ITT Corporation. ITT Night Vision can be served with process through ITT Corporation's registered agent.

7.     Defendant ITT Geospatial Systems is or was, upon information and belief, an unincorporated division of ITT Defense and Information Solutions, which is or was an unincorporated segment of ITT Corporation. ITT Geospatial Systems can be served with process through ITT Corporation's registered agent.

8.     Defendant Exelis Inc. d/b/a ITT Exelis is an Indiana corporation with its principal place of business in McLean, Virginia. Exelis Inc. can be served with process through its registered agent, CT Corporation, 350 N. St. Paul Street, Suite 2900, Dallas, Texas, 75201.

9.     Defendant ITT Exelis Geospatial Systems is, upon information and belief, an unincorporated segment of Exelis Inc. d/b/a ITT Exelis. It can be served with process through Exelis Inc.'s registered agent.

### III.     JURISDICTION AND VENUE

10.     This Court has jurisdiction over this matter based on diversity of citizenship. *See* 28 U.S.C. § 1332. Plaintiff Raytheon is a corporation incorporated under the laws of Delaware with its principal place of business in Massachusetts. Defendant ITT Corporation is a corporation incorporated under the laws of Indiana with its principal place of business in New York; Defendant Exelis Inc. d/b/a ITT Exelis is a corporation incorporated under the laws of Indiana with its principal place of business in Virginia; and the remaining defendants are all unincorporated segments or divisions of ITT Corporation or Exelis Inc. The amount in controversy, without interest and costs, exceeds $75,000.

3

11.     The ENVG-001 subcontract between Raytheon and ITT contains a forum selection clause providing that "[a]ny dispute that cannot be resolved between the parties shall be resolved exclusively through litigation in any competent court in the State of Texas (including federal courts)."

12.     Venue is proper in this judicial district and division under 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to the claims occurred in McKinney, Texas, in this judicial district and division.

## IV.     FACTUAL BACKGROUND

13.     In or around January 2005, Raytheon and ITT worked collaboratively to prepare and submit a proposal to the U.S. Army on behalf of ITT for the design, development, and production of Enhanced Night Vision Goggles ("ENVG"):

> The ENVG is the first helmet-mounted night vision monocular to combine the strengths of both image intensification (I2) and infrared (IR, or thermal) technologies into one device.  In 2005 ITT was selected by the U.S. Army to be the sole source for the system.

> ITT's ENVG optically combines an I2 image and an uncooled Infrared (IR - thermal) image, allowing for improved mobility and situational awareness.  The monocular system uses I2 to provide clear target identification and IR to provide improved target detection.  By combining the strengths of both technologies into one unit, soldiers are able to complete their missions more effectively.

"Enhanced Night Vision Goggles (ENVG) Development," Defense Update Online Defense Magazine, *at* http://defense-update.com/products/e/envg.html.  The U.S. Army awarded the ENVG contract to ITT in or around March 2005.

14.     ITT then entered into a subcontract with Raytheon pursuant to which Raytheon was to manufacture, test, and deliver to ITT the infrared thermal cameras that would be included in the ENVG system.  The effective date of this Subcontract No. ENVG-001 (the "ENVG subcontract") was April 26, 2005.

15.     In July 2005, ITT issued a purchase order to Raytheon pursuant to the ENVG subcontract that called for Raytheon to produce and deliver to ITT approximately 2,000 thermal cameras in a four-battery configuration (the "PY1 purchase order").  Over the course of the next several years, Raytheon fulfilled the PY1 purchase order and ITT delivered to the U.S. Army completed ENVG systems utilizing Raytheon's cameras.

16.     The Army then ordered additional ENVG systems from ITT, and ITT again wanted Raytheon to provide thermal cameras for these systems.  This time, however, the parties decided to try to earn an incentive payment offered by the government if they could produce ENVG systems that utilized less power.  Thus, ITT and Raytheon negotiated a new purchase order for the production of 7,000 thermal cameras, this time in a three-battery configuration (the "3B purchase order").  The 3B purchase order was issued pursuant to and in accordance with the terms and conditions of the ENVG subcontract, and was dated December 23, 2008.

17.     The 3B purchase order, in conjunction with the ENVG subcontract, requires several levels of testing and approval.  First, Raytheon's camera was required to pass internal testing conducted by Raytheon, called the Initial Production Test ("IPT").  Second, the camera must also be incorporated into the larger ENVG system and pass system-level testing conducted by ITT.  Finally, once both tests are

passed and the ENVG system is thus "qualified," reports of the test results must be submitted to the U.S. Army for approval.  After the ENVG system qualification is approved by the government, ITT is required to approve Raytheon's camera and accept delivery of all the camera units called for by the 3B purchase order.

18.     Several months after ITT issued the 3B purchase order to Raytheon, ITT exercised its contractual option to reduce its order from 7,000 to 2,000 cameras, which was the minimum amount of qualified cameras ITT was contractually required to accept.

19.     Despite this order reduction, Raytheon had already expended a significant amount of time and money on the engineering effort associated with development of a three-battery thermal camera.  The timeframe for this redesign was extremely compressed, as the 3B purchase order required Raytheon to deliver the first 30 cameras to ITT in August 2009—just seven months after the execution date of the 3B purchase order.

20.     In order to meet this extremely aggressive delivery schedule, Raytheon insisted on a provision in the 3B purchase order that required ITT to provide Raytheon with the goggle housing by the end of January 2009, as well as five complete ENVG systems (not including Raytheon's thermal camera) by the middle of April 2009.  (Collectively, this material is referred to in the 3B purchase order as "Customer Furnished Equipment (CFE).")

21.     It was essential for Raytheon to receive this CFE in a timely manner so that it could validate that its camera's software and firmware could integrate

properly with the ENVG system—consequently cutting several months off of the design, integration, and delivery schedule.

22.    In addition, Raytheon needed the CFE to ensure that the modifications made from the original PY1 camera to the 3B camera would not adversely impact system-level ENVG testing, including but not limited to electromagnetic interference ("EMI") testing.

23.    EMI testing requires that the ENVG system's electromagnetic emissions remain below a specified level so as to not interfere with other electronic components that might be located in close proximity to the soldier.  The electronics contained in the thermal camera inherently produce electromagnetic emissions, so ITT and Raytheon agreed in their initial government proposal that it would be the role of the system's goggle housing to shield those emissions and enable the system to satisfy EMI requirements.  If ITT were making any changes to the PY1 goggle housing at the system level that might impact EMI, having the CFE would enable Raytheon to identify such impacts to ITT and enable ITT to make necessary and timely modifications to its goggle housings (thereby ensuring the successful completion of EMI testing).

24.    Despite having agreed to provide the CFE by the deadlines reflected in the 3B purchase order, ITT failed to do so.  It did not provide Raytheon with the goggle housing by the end of January 2009, nor did it provide five complete ENVG systems by the middle of April 2009.  In the meantime, Raytheon could only test its redesigned thermal camera using old goggle housings that were left over from the PY1 systems, and the camera passed EMI testing in that environment.

25.     Raytheon was aware, however, that ITT could be modifying the design of its goggle housings, so throughout May and June 2009, Raytheon repeatedly requested that ITT provide it with the CFE, explaining that its failure to do so was jeopardizing the planned August delivery of the first 30 cameras.  Despite having already agreed to provide the CFE in the 3B purchase order, ITT responded on multiple occasions that it did not understand why Raytheon needed the system-level components.  ITT finally sent a letter to Raytheon saying essentially that Raytheon should not concern itself with EMI, as it was a system-level test beyond the scope of Raytheon's subcontract, and that the CFE was not necessary for Raytheon to verify that its camera met the required performance specifications.  Thus, because ITT clearly intended to shoulder responsibility for satisfying EMI obligations with its goggles shielding the camera's emissions, Raytheon relied on this guidance and continued to design and develop its three-battery camera to have electromagnetic emission levels nearly identical to those of its PY1 camera.

26.     ITT's failure to provide CFE in accordance with the contractually required schedule caused the parties to have to extend the delivery date for the first 30 cameras from August to November 1, 2009.  Four days before that deadline, Raytheon delivered the cameras as required and, shortly thereafter, ITT visited Raytheon's lab in McKinney, Texas, to perform system-level testing of the three-battery ENVG system.  This was the first time that Raytheon had the opportunity to see the production-ready goggle housing developed by ITT for the 3B system, which was significantly modified from the PY1 goggle housing.  And as Raytheon had feared—and warned ITT—the ENVG system failed EMI testing.

27.     Despite the parties' clear understanding that it was ITT's goggle housing that would be responsible for ensuring system-level compliance with EMI standards, ITT blamed the EMI testing failure on Raytheon's camera and told Raytheon to research and fix the problem.  After spending significant time and effort over the next several months working to identify the source of the problem, Raytheon determined that the root cause of the EMI testing failure was a degraded Faraday shield in the goggle housing, which was directly attributable to ITT's goggle housing modifications.

28.     Upon making this determination, Raytheon provided written notice to ITT that it was asserting a claim for $626,237—the costs incurred by Raytheon as a result of the extra-contractual testing and schedule delays caused by ITT's conduct. ITT then retaliated, threatening that it would not submit Raytheon's three-battery camera for qualification testing—thereby depriving Raytheon of the right to deliver the remaining 1,970 cameras called for by the 3B purchase order—unless Raytheon agreed to withdraw its claim.  Despite ITT's bad-faith behavior, the parties eventually reached an agreement: Raytheon would temporarily suspend its claim in return for ITT's promise to do each of the following in good faith: immediately re-start qualification of the Raytheon 3B camera, obtain government approval of the system, authorize Raytheon to produce the remaining 1,970 cameras, take delivery of all the hardware, and pay Raytheon the amounts specified in the subcontract. Raytheon retained the right to re-assert and pursue its EMI claim, however, if ITT failed to satisfy any of these conditions.

29.     Since the spring of 2009, Raytheon had been aware that ITT was communicating with one of Raytheon's thermal camera competitors about the specifications for Raytheon's ENVG thermal camera.  This caused Raytheon to believe that ITT was looking for another camera source.  Raytheon was not happy about this development, but Raytheon did not object because it had the protection of a binding subcontract with ITT.  In addition, given the promises made by ITT to get Raytheon to suspend its EMI claim, it was reasonable for Raytheon to rely on such promises and believe that ITT intended to honor its binding obligation to purchase 2,000 thermal cameras in the 3B configuration.

30.     After the parties agreed to the temporary suspension of Raytheon's EMI claim, ITT reported that it had made multiple system-level modifications that dramatically improved the EMI performance of the ENVG system and brought it within the required specification.  ITT thus finally admitted, and purportedly fulfilled, what had been its responsibility all along—to ensure compliance with EMI standards at the system level.  And from Raytheon's perspective, this admission put an end to the EMI issue.  It was not until over a year later—*after* Raytheon had sent a letter informing ITT that ITT was in breach of the parties' contract—that ITT resurrected the EMI issue and again attempted to blame it on Raytheon.

31.     After ITT reported that it had resolved the EMI issue at the system level, ITT then continued system-level testing.  In April 2011, stemming from that testing, ITT sent Raytheon two Supplier Corrective Action Requests ("SCARs") that purported to identify alleged problems with Raytheon's cameras.  In the first SCAR, ITT claimed that eleven of Raytheon's thirty cameras exhibited defective or washed

out pixels.  In the second SCAR, ITT claimed that two of Raytheon's thirty cameras failed to power on during the cold temperature cycle of reliability testing.

32.     Almost immediately upon receiving the two SCARs, Raytheon sent one of its engineers to ITT to investigate these issues.  As a result of this site visit and subsequent testing and evaluation, Raytheon determined that the root cause of both problems was not Raytheon's cameras, but rather ITT itself.

33.     First, as to the defective pixels, Raytheon's engineer quickly determined that the problem was the result of ITT having disassembled the components of Raytheon's camera and then reassembled them incorrectly.  The components of each individual camera are specifically configured to work together as a matched set, identified by serial number, and ITT simply failed to match up the components' serial numbers before reassembly.  When the problem cameras were reassembled in appropriately matched sets, the pixel problem was remedied.

34.     As to the second SCAR, which claimed that two of Raytheon's cameras failed to power on during the cold temperature cycle of reliability testing, Raytheon determined that this too was attributable to ITT.  The thermal camera performance specifications agreed to by Raytheon and ITT required the cameras to withstand low temperature storage conditions of -46°C, and to operate at a low temperature of -40°C.  Raytheon reconfirmed through testing that the two suspect cameras did indeed withstand storage at -46°C and operate as required at -40°C.  As discussed in the following paragraph, the reason that these two cameras were not powering on during the cold temperature cycle of reliability testing, however, was that ITT was erroneously attempting to power them on at temperatures below -40°C.

35.     During a site visit to ITT, Raytheon's engineer discovered that ITT's reliability test procedure was to first adjust the test chamber's air temperature to -46°C, soak the camera at that temperature for a period of time, and then perform the storage test.  ITT then turned the test chamber's air temperature up to -40°C, but attempted to power on the cameras for the operation test after only two minutes of time had passed.  Two minutes is not sufficient time to allow the temperature of the camera unit to catch up with the air temperature and stabilize at -40°C.  Indeed, the U.S. Department of Defense's standard procedures for low temperature operation testing—which are incorporated into Raytheon's contractual performance specifications—indicate that the unit's temperature should be allowed to stabilize for two *hours* before attempting to power on the unit.

36.     In response to this second SCAR, Raytheon explained the problem with ITT's test procedure and recommended that ITT adjust its test to allow the system to reach a stable temperature of -40°C before operation of the unit.

37.     Raytheon provided ITT with both written SCAR responses in early June 2011.  At this point in time, ITT went into radio silence.  In the meantime, Raytheon successfully completed its internal testing of the thermal camera and submitted its IPT report to ITT.

38.     On July 7, 2011, Raytheon sent a follow-up letter summarizing its SCAR responses and requesting that ITT immediately authorize Raytheon to proceed with the manufacture and delivery of the remaining 1,970 thermal cameras.

39.     ITT never provided a formal, substantive reply to Raytheon's SCAR responses.  Instead, through various telephone calls and e-mails, ITT employees

informed Raytheon that ITT understood Raytheon's position regarding the low temperature operation issue, but that ITT was unable to change its reliability testing procedure because that procedure had already been approved by the government.

40.     As noted above, however, Raytheon's contractual obligation was to provide cameras that operate at the contractually specified temperature of -40°C, and it has done that.  If ITT agreed on test procedures with the government that, in effect, required performance in excess of that specification, this decision was a mistake on the part of ITT and it would not change Raytheon's contractual obligation nor would it obligate Raytheon to meet this new requirement.

41.     Despite having no contractual right to do so, ITT nevertheless insisted that Raytheon do something to ensure that the remaining two cameras would pass the existing test. But Raytheon cannot reasonably ensure any such thing.  Even if Raytheon were to make some change to its cameras, it is simply impossible for Raytheon to guarantee that they will pass ITT's existing test because the electronics used on the cameras' circuit cards are commercial grade electronics that are only guaranteed to work at −40°C; not at lower temperatures.  So even if the circuit cards might sometimes successfully operate at temperatures below −40°C, Raytheon could never guarantee such performance because the best available component parts are not guaranteed for such use.

42.     Furthermore, ITT has always been aware of this limitation: its own 2005 ENVG proposal to the U.S. Army promised operation at only the threshold requirement of −40°C, and explicitly stated that "[t]he fact that the ENVG operated properly at −46°C in this test does not guarantee that it will work all the time. The

electronics used on the circuit cards are commercial grade electronics qualified to work at −40°C, but not guaranteed to work at −46°C . . . ." Thus, as ITT has known from the beginning, Raytheon can do no more than provide ITT with thermal cameras that meet the contractual specification of −40°C, and Raytheon has done exactly that.

43.     Because it is ITT's test procedures that are improperly requiring operation of the cameras at temperatures below -40°C, the best and only solution to this problem is for ITT to change its test procedures.  ITT simply refuses to do so.  Why?  Because ITT is looking for an excuse to avoid its contract with Raytheon.  An ITT employee told Raytheon personnel in multiple telephone conversations in June and July 2011 that ITT had obtained another thermal camera supplier and expected that ITT would have to cancel the 3B purchase order and negotiate a settlement with Raytheon.  But if ITT could instead identify some problem with Raytheon's cameras, then it could avoid having to accept the remaining 1,970 cameras called for by the 3B purchase order without paying Raytheon any settlement at all.

44.     ITT's transparent attempt to avoid its contractual obligations to Raytheon must fail, however, because there is no problem with Raytheon's cameras.  They meet all contractual specifications.  ITT is simply attempting to shift the blame for system-level EMI and reliability testing failures from itself—where the responsibility in fact lies—to Raytheon instead.  ITT's bad-faith refusal to qualify Raytheon's cameras breaches the parties' contract.  Raytheon sent ITT a notice of this material breach on August 22, 2011, and ITT failed to remedy the breach during the contractually conferred 60-day cure period.

14

45.     Instead, on the very last day of the cure period, ITT sent a letter to Raytheon alleging that it was Raytheon that was in material breach of the parties' subcontract.  The letter once again rehashed the EMI and reliability testing failures and attempted to blame them on Raytheon—which, for the reasons set forth above, is demonstrably wrong.  In addition, the letter also alleged—for the very first time— that Raytheon was in material breach of the subcontract because it did not submit a revised "Quality Validation Plan" and because its IPT report allegedly contained errors.  But these allegations are nothing more than immaterial documentation issues that ITT has manufactured in an attempt to avoid its own contractual liability. Moreover, the extremely late date at which ITT raised these issues for the first time—three months after Raytheon submitted its IPT report and *two years* after ITT alleges that a revision of the QVP was required—is further evidence of ITT's bad faith.  Had ITT ever intended to honor its obligation to qualify and accept Raytheon's camera, ITT would have reviewed Raytheon's QVP and IPT report and provided feedback in a timely manner.

46.     Because ITT is in material breach of the parties' subcontract, and because it has failed to remedy that breach, Raytheon has been forced to file suit to recover its damages.  Those damages include, but are not limited to, the profit Raytheon expected to earn in fulfilling the 3B purchase order of at least $1 million; the approximately $8 million in costs Raytheon has incurred in purchasing the materials necessary to produce the remaining 1,970 cameras called for by the 3B purchase order; the $626,237 of extra-contractual costs that formed the basis of Raytheon's claim against ITT related to EMI testing; and the approximately $4

million of costs Raytheon has incurred in the good faith belief that ITT intended to qualify its cameras, authorize production, and make payment in accordance with the 3B purchase order.

## V.   CLAIMS FOR RELIEF

### Count One – Breach of Contract

47.    Raytheon hereby incorporates by reference the preceding allegations of this Complaint as if fully set forth herein.

48.    As described above, ITT and Raytheon entered into the ENVG subcontract and 3B purchase order, which constitute a valid and enforceable contract that requires ITT to conduct system level testing and qualify Raytheon's contractually compliant cameras; submit the ENVG system to the government for approval; accept delivery of all the camera units called for by the purchase order; and pay for them.

49.    The ENVG subcontract and 3B purchase order are contracts for the sale of goods worth more than $500, and are therefore subject to the obligation of good faith in their performance and enforcement provided for in section 1.304 of the Texas Business and Commerce Code.

50.    Raytheon has performed all of its material obligations under the ENVG subcontract and 3B purchase order.

51.    ITT breached the ENVG subcontract and 3B purchase order by failing to perform in good faith its contractual duties to conduct system level testing and qualify Raytheon's contractually compliant cameras.

52.     As a result of these breaches, Raytheon has been damaged because it spent a significant amount of time and money developing and manufacturing the thermal cameras and because it has been deprived of its bargained-for profits under the contract.

### Count Two - Promissory Estoppel

53.     Raytheon hereby incorporates by reference the preceding allegations of this Complaint as if fully set forth herein.

54.     Raytheon alternatively pleads promissory estoppel.

55.     After refusing to provide Raytheon the CFE, ITT promised that Raytheon should not concern itself with the EMI testing and that the CFE was not necessary for Raytheon to verify that its camera met the required performance specifications.  Thus, ITT promised that it would be responsible for satisfying EMI obligations at the system level.

56.     ITT also promised, in order to induce Raytheon to temporarily suspend its EMI claim, to act in good faith to qualify Raytheon's cameras, submit the cameras in the ENVG system to the government for approval, accept delivery of the remaining camera units, and pay for them.

57.     Raytheon reasonably and substantially relied on ITT's promises.

58.     ITT knew, or reasonably should have known, that Raytheon would rely on ITT's promises by continuing to design, develop, and produce the thermal cameras.

59.     Injustice cannot be avoided unless ITT's promises are enforced.

60.     ITT's failure to honor its promises to Raytheon resulted in injury, damages, and loss to Raytheon, as Raytheon spent significant time and effort designing a three-battery camera using PY1 goggle housing; working to identify the source of the EMI testing failure, which was directly attributable to ITT's goggle housing modifications; purchasing the materials necessary to manufacture the 2,000 thermal cameras called for by the 3B purchase order; and continuing to take all other necessary steps to produce qualifying cameras.  Raytheon is entitled to recover damages from ITT.

### Count Three - Fraud

61.     Raytheon hereby incorporates by reference the preceding allegations of this Complaint as if fully set forth herein.

62.     In the spring of 2009, a Raytheon employee witnessed an ITT employee sending an instant message to another ITT employee regarding the specifications for Raytheon's ENVG thermal camera and whether they would be consistent with cameras manufactured by one of Raytheon's competitors, a company called N2 Imaging Systems.

63.     Yet in agreements memorialized in letters between ITT and Raytheon on October 7 and November 5, 2010, ITT made representations that it would act in good faith to qualify Raytheon's camera, submit the cameras in the ENVG system to the government for approval, accept delivery of the remaining camera units, and pay for them.

64.     Despite these promises, in June and July 2011, an ITT employee informed Raytheon personnel that ITT had in fact obtained another thermal camera

supplier for this particular government contract—the same supplier with which an ITT employee was witnessed instant messaging about that very contract a year earlier.

65.     Thus, when ITT made the representations to Raytheon in October and November 2010, ITT knew the representations were false, or made the representations recklessly, and without knowledge of their truth.

66.     The representations were false because at the time ITT made such representations, ITT did not intend to fulfill them, but rather intended to purchase thermal cameras from Raytheon's competitor, with whom ITT was already communicating about such purchase.

67.     ITT made the representations with the intent that Raytheon would rely on them.

68.     Such representations were material because had ITT not made them, Raytheon would not have suspended its EMI claim at that time or proceeded to fulfill its contractual obligations.

69.     To its detriment, Raytheon reasonably relied on the false representations and, as a result of that reliance, ITT caused Raytheon injury.

## VI.    CONDITIONS PRECEDENT

70.     All conditions precedent to Raytheon's claims for relief have been performed or have occurred.

## VII.   ATTORNEYS' FEES

71.     Raytheon is entitled to recover reasonable and necessary attorneys' fees under Texas Civil Practice and Remedies Code § 38.001 because ITT is in breach of a written contract.

## VIII.  JURY DEMAND

72.     Raytheon respectfully demands a jury trial in this matter.

## IX.     PRAYER FOR RELIEF

For these reasons, Raytheon respectfully requests that Defendants be cited to appear and answer this Complaint, and that upon final hearing and determination of this matter, the Court enter judgment against ITT awarding Raytheon the following:

a.      Actual damages, including expectancy damages, lost profits, costs of delay in performance, reliance damages, and restitution damages as appropriate;

b.      Alternatively, should the Court determine monetary damages are not adequate, specific performance of ITT's obligations under the ENVG subcontract and 3B purchase order, including the purchase of the remaining 1,970 thermal cameras, which are special, peculiar, and/or unique;

c.      Prejudgment and postjudgment interest;

d.      Court costs;

e.      Attorneys' fees and expenses; and

f.      All other further relief, both at law and in equity, to which Raytheon may be entitled.

Dated: December 6, 2011

Respectfully submitted,

/s/ *Matthew D. Orwig*

Matthew D. Orwig
   Texas State Bar No. 15325300
   matt.orwig@snrdenton.com
C. Shawn Cleveland
   Texas State Bar No. 24012433
   shawn.cleveland@snrdenton.com
Emily Coleman McCall
   Texas State Bar No. 24055927
   emily.mccall@snrdenton.com
SNR DENTON US LLP
2000 McKinney, Suite 1900
Dallas, Texas 75201
(214) 259-0900
(214) 259-0910 fax

*Attorneys for Plaintiff Raytheon Company*